# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

UNITED STATES OF AMERICA ex rel.
NORMA ARIAS BENITEZ, *et al.*,

       Relator,

v.

GALLIANO, LLC, *et al.*,

       Defendants.

Case No. 2:15-cv-01688-LDG (NJK)

**ORDER**

      The plaintiff, Norma Arias Benitez, brought this qui tam action on behalf of the United States under the False Claims Act.  In her Amended Complaint (ECF No. 39), Benitez alleges she rented housing from the defendants–Galliano, LLC (the owner of the premises) and Golden River Investments, LLC (who acted as Galliano's agent).  As the tenancy was governed by Section 8, Galliano entered into a contract with the Southern Nevada Regional Housing Authority (SNRHA) establishing that the rent would be $994.  Galliano further agreed that it would not attempt to collect additional rent.  Benitez alleges, however, that the defendants improperly and illegally charged her rent in excess of this amount.

1   The parties have filed cross-motions for summary judgment on Benitez's FCA claim.

2   (ECF Nos. 42, 62, 63). The defendants have argued that Benitez can neither establish

3   they acted with scienter in seeking to collect $1,191 from her each month, nor that their

4   statement that they would collect additional rent, nor their conduct of seeking additional

5   rent, was material. The Court disagrees, and grants partial summary judgment in favor of

6   Benitez.

7   Galliano has also moved to strike Benitez' reply to its opposition to her motion (ECF

8   No. 58), which the Court denies.

9   Benitez also seeks a declaration that she does not owe late-payment fees to the

10  defendants, and that defendants failed to return her security deposit. Golden River filed a

11  counterclaim seeking payment of the late fees (ECF No. 40), and further seeks summary

12  judgment as to Benitez' related claims (ECF No. 62). Benitez moves to dismiss the

13  counterclaims (ECF No. 43).[1] The Court will deny the defendants request for summary

14  judgment on Benitez' related claims. The Court will deny Benitez' motion to dismiss

15  Golden Rivers counterclaim for breach of contract, but will grant the motion as to Golden

16  River's other counterclaims.

17  Motion for Summary Judgment

18  In considering a motion for summary judgment, the court performs "the threshold

19  inquiry of determining whether there is the need for a trial—whether, in other words, there

20  are any genuine factual issues that properly can be resolved only by a finder of fact

21  because they may reasonably be resolved in favor of either party." *Anderson v. Liberty*

22

23  [1]   The defendants also filed motions to dismiss the original complaint. In a stipulation permitting Benitez to file an Amended Complaint, (ECF No. 37), the parties

24  further stipulated that the Court could consider those motions as if filed in response to the Amended Complaint. In moving to dismiss, the defendants submitted and referenced

25  documents integral to the pleadings. The cross-motions for summary judgment rely upon many of the same documents and some of the same arguments are presented in the

26  defendants' motions to dismiss. Accordingly, in the interest of judicial economy, the Court will deny the defendants' motions to dismiss as moot.

1  *Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir.

2  2012).  To succeed on a motion for summary judgment, the moving party must show (1)

3  the lack of a genuine issue of any material fact, and (2) that the court may grant judgment

4  as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

5  (1986); *Arango*, 670 F.3d at 992.

6        A material fact is one required to prove a basic element of a claim. *Anderson,* 477

7  U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

8  renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  Additionally, "[t]he mere

9  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

10  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting

11  *Anderson*, 477 U.S. at 252).

12        "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

13  adequate time for discovery and upon motion, against a party who fails to make a showing

14  sufficient to establish the existence of an element essential to that party's case, and on

15  which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Of

16  course, a party seeking summary judgment always bears the initial responsibility of

17  informing the district court of the basis for its motion, and identifying those portions of 'the

18  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

19  affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

20  fact." *Id.*, at 323.  As such, when the non-moving party bears the initial burden of proving,

21  at trial, the claim or defense that the motion for summary judgment places in issue, the

22  moving party can meet its initial burden on summary judgment "by 'showing'–that is,

23  pointing out to the district court–that there is an absence of evidence to support the

24  nonmoving party's case." *Id.*, at 325.  Conversely, when the burden of proof at trial rests

25  on the party moving for summary judgment, then in moving for summary judgment the

26  party must establish each element of its case.

1   Once the moving party meets its initial burden on summary judgment, the non-

2   moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

3   56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.

4   2000).  As summary judgment allows a court "to isolate and dispose of factually

5   unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

6   evidence before it "in the light most favorable to the opposing party."  *Adickes v. S. H.*

7   *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

8   will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

9   *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot

10  "'rest upon the mere allegations or denials of [its] pleading' but must instead produce

11  evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"

12  *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed.

13  R. Civ. Pro. 56(e)).

14  <u>Background</u>

15   Both defendants argue, in their respective oppositions to Benitez' motion for

16  summary judgment, that her motion should be denied because much of it rests upon

17  documents that Benitez has not authenticated.  A review of Benitez' motion indicates,

18  however, that it generally rests on allegations that neither defendant has disputed.  While

19  the defendants take issue with the submission of a copy of Golden River's ledger, they do

20  not dispute that the proffered copy is an accurate copy of the ledger.  Benitez has, in her

21  reply, authenticated the document and indicates she received the ledger from Golden

22  River.  Further, the defendants have not disputed that a pivotal fact established by the

23  ledger: that after deducting the Section 8 assistance payment charged to the SNRHA, they

24  charged Benitez an amount that exceeded, by $197, her portion of the rent.  Benitez'

25  motion also rests upon documents that the defendants acknowledged and attached to their

26  motions to dismiss, and documents that Golden River attached to its motion for summary

1   judgment, which motion Galliano joined.  Accordingly, the Court will not deny Benitez'

2   motion on this basis.

3          Benitez leased housing owned by Galliano and managed by Golden River.  Benitez

4   is a recipient of a Section 8 Public Housing Voucher through the Southern Nevada

5   Regional Housing Authority (SNRHA).

6          Under the Section 8 program, the U.S. Department of Housing and Urban

7   Development enters into annual contribution contracts with public housing agencies, such

8   as the SNRHA, to administer federal subsidy payments for low-income housing.  When a

9   tenant locates a suitable unit for rent and obtains the owner's consent to participate in the

10  Section 8 program, the tenant and owner submit a Request for Tenancy Approval (RTA) to

11  the SNRHA.  In the RTA, the tenant and owner identify which party will be responsible for

12  providing or paying for utilities, such as sewer and trash, or the provision of appliances.

13  Along with the RTA, the tenant and owner must also submit a completed and signed, but

14  undated, lease agreement to the SNRHA.

15         When the SNRHA receives an RTA and proposed lease, the SNRHA's inspection

16  department tests the proposed rent to be charged by the owner, which will be subsidized

17  by payments from the SNRHA, for affordability and reasonableness.  Rent is considered

18  reasonable if it falls within the range of rent charged for similar housing within the

19  community.  Rent is considered affordable if it does not exceed 40 percent of a tenant's

20  reported income.  Rent will be subsidized under the Section 8 program only if it is both

21  affordable and reasonable.

22         If the proposed rent exceeds the amount of rent determined to be either affordable

23  or reasonable, the SNRHA contacts the owner to determine whether the owner is willing to

24  proceed at a reduced amount of rent that does not exceed the permissible affordable and

25  reasonable rent.  If the owner does not agree to reduce the rent, the SNRHA will not

26  subsidize the rent for the tenancy.

1       If the owner agrees to proceed and accept the reduced amount of rent that the

2   SNRHA determined to be both affordable and reasonable, the owner and the SNRHA enter

3   into a Housing Assistance Payments (HAP) contract.  Pursuant to this contract, SNRHA

4   makes monthly housing assistance payments on behalf of the eligible tenants.  The HAP

5   contract also establishes the maximum rent that the owner may charge the tenant.  More

6   particularly, the HAP contract prohibits the owner from charging the tenant rent in excess of

7   the amount of the approved rent.

8       In addition to the HAP contract, the property owner and tenant enter into a lease

9   agreement that is consistent with the HAP contract and that complies with federal

10  regulations.  The owner and the tenant must also identify, consistent with the terms of the

11  HAP contract and the lease, responsibility for providing and paying for utilities, including

12  sewer and trash, and appliances.

On December 14, 2012, Galliano and Benitez signed a lease agreement,[2] on a Residential Lease Agreement form, for the premises that Benitez intended to lease under the Section 8 program.[3]  The heading for Section 2 of the form is "SUMMARY," and the form indicates the section concerns "[t]he initial rents, charges and deposits . . . ." Pursuant to line 5 of this section, the rent for the period from 1/17/13 to 1/31/13 was $481. Line 6 recites that the Security Deposit for the unit was $994, an amount equal to one month of rent.  On line 15, the parties recited: "SEWER/TRASH $35."

Section 3 of the lease, under the heading "ADDITIONAL MONIES DUE," recites that "RENTAL PAYMENT WILL BE $1,191 INCLUDING SEWER AND TRASH . . . ."

The heading for Section 5 is "TERM."  The section recites that the term of the lease would commence on January 17, 2013, and continue until January 31, 2014, for a total rent

---

[2]    In opposing Benitez' motion, Galliano argues there is no evidence that it signed or reviewed or was aware of any of the documents at issue in this case.  Galliano attached the declaration of Pauline Yeung to its opposition.  Yeung who states that she is the sole trustee and beneficiary of Global Investments Trust, which is the sole officer of Galliano.  She admits that Galliano is the owner of the property it leased to Benitez. Galliano has also admitted that Golden River acted as its property manager for the housing unit at issue.

> When an agent acts in the name of the entity, to secure
> government funding, the fraudulent intent of the agent is
> indistinguishable from the intent of the entity.  So long as the
> agent has actual or apparent authority to bind the entity, the
> fraud of the agent is sufficient to support civil liability against the
> entity.

*United States ex rel. Rosales v. San Francisco Housing Authority*, 173 F.Supp.2d 987, 1003 (N.D. Cal. 2001)

Accepting, for purposes of this motion, Galliano's assertion that it was unaware of Golden River's action taken on its behalf, such lack of awareness or knowledge does not establish that Golden River was not acting on behalf of Galliano.  Neither Galliano nor Golden River have proffered any argument or evidence that Golden River did not sign the documents at issue in this matter, whether in its own name or in the name of Galliano.

For ease of reference, and because Golden River acted on behalf of Galliano, the Court's references to actions taken by Galliano refer to all actions taken either by Galliano or by Golden River on behalf of Galliano.

[3]    This lease was to be submitted signed but undated to the SNRHA.  The form was dated of December 14, 2012.  The document submitted to the Court is signed, but the parties have not indicated the date on which the lease was signed.

1  of $12,609.00, then on a month-to-month basis.  The heading for Section 6 is "RENT."  The
2  section recites that the monthly rent for the premises is $994.

3          The heading for Section 16 is "UTILITIES."  The language of the form recites that
4  the tenant shall immediately connect all utilities and is to pay all utilities and other charges
5  in connection with the premises.  The section, however, then provides blank spaces
6  allocating responsibility for electricity, trash, phone, gas, sewer, cable, water, septic, and
7  association fees as between the owner and tenant.  Each of the blanks are completed with
8  a typewritten "T" indicating that Galliano and Benitez allocated responsibility to her for each
9  of the utilities items except septic (no allocation) and association fees (allocated to the
10  owner).  In subsection 16.a, that parties indicated that the "TENANT is responsible to
11  connect the following utilities in TENANT'S name: POWER, GAS, WATER, PHONE,
12  CABLE & RENTER'S INSURANCE."  In subsection 16.b, the parties recite that
13  "LANDLORD will maintain the connection of the following utilities in LANDLORD'S name
14  and bill TENANT for connection fees and use accordingly: SEWER & TRASH."

15          The heading for Section 34 is "CONFLICTS BETWEEN LEASE AND ADDENDUM."
16  The entirety of text of the section is form language, and provides, "In case of conflict
17  between the provisions of an addendum and other provisions of this Agreement, the
18  provisions of the addendum shall govern."

19          Benitez also signed, on December 14, 2012, a document on Golden River
20  stationary, titled "Addendum #2."  The document states: "The rent is $1191 per month,
21  which includes sewer and trash.  Tenant, Norma Ariasbenitez has Section 8.  Tenant is
22  responsible to pay the remaining portion of what Section 8 does not cover." In her
23  declaration, Tam acknowledges having Benitez sign this document to acknowledge the
24  agreement.

25          On that same date, Galliano and Benitez signed an RTA that Golden River
26  subsequently submitted to the SNRHA.  On the RTA, the parties recited that the proposed

1  rent was $1099.  The parties also completed the RTA form to indicate that heating,

2  cooking, water heating, air conditioning, refrigerator, water, sewer, and trash collection

3  would be provided by the owner and paid for by the tenant.

4      While the SNRHA determined that a rent of $1099 would be a reasonable rent within

5  the community, it further determined that this amount of rent was not affordable as it

6  exceeded 40% of Benitez's stated income.

7      On January 3, Galliano signed a "Reduction of Rent Acknowledgment."  In doing so,

8  Galliano agreed to reduce the rent from $1,099 to $994 so that Benitez could qualify for

9  payment assistance for the housing based upon the 40% rule.  Galliano further agreed that

10  no additional rent would be collected from Benitez and that if it was discovered that

11  additional rent was being collected, the HAP contract would be terminated and the owner

12  would no longer be allowed to rent housing to Housing Choice Voucher participants.

13  Galliano further agreed to lower the security deposit so that it would not exceed one

14  month's rent and acknowledged its understanding that the owner could not "collect the

15  difference in the rent change from [Benitez] resident/client; by doing so is a breach of the

16  Housing Choice Voucher Contract . . .."

17      On January 17, 2013, Galliano signed the HAP contract.  Part A of the HAP contract

18  includes the following terms.  Paragraph 5 recites that the initial term of the lease is

19  January 17, 2013, through January 31, 2014.  Paragraph 6 recites that the initial rent to

20  owner is $994 and that "the owner may not raise the rent to owner."  Paragraph 8 recites

21  that the tenant "shall provide or pay for" heating natural gas, cooling air conditioning,

22  cooking natural gas, other electric, water heating gas, water, sewer Las Vegas and

23  Henderson, and trash collection.  The same paragraph provides that the "owner shall

24  provide or pay for" the refrigerator and range.  This paragraph further indicates that

25  "[u]nless otherwise specified below, the owner shall pay for all utilities and appliances

26

1  provided by the owner."  The contract lacks any indication that the tenant would be

2  responsible for paying for the refrigerator or range.

3          Part B of the HAP contract is identified as the "Body of Contract."  Paragraph 2.d of

4  this Part provides: "The owner certifies that: (1) The owner and the tenant have entered

5  into a lease of the contract unit that includes all provisions of the tenancy addendum."

6  Paragraph 5 provides: "(a) The lease must specify what utilities are to be provided or paid

7  by the owner or the tenant. (b) The lease must specify what appliances are to be provided

8  or paid by the owner or the tenant. (c) Part A of the HAP contract specifies what utilities

9  and appliances are to be provided or paid by the owner or tenant.  The lease shall be

10  consistent with the HAP contract."  Paragraph 7(b) of Part B provides: "Unless the owner

11  has complied with all provisions of the HAP contract, the owner does not have a right to

12  receive housing assistance payments under the HAP contract."

13          Paragraph 8 of Part B identifies additional owner certifications.  Paragraph 8(b)

14  provides, "The contract unit is leased to the tenant.  The lease includes the tenancy

15  addendum (Part C of the HAP contract), and is in accordance with the HAP contract and

16  program requirements.  The owner has provided the lease to the PHA [the SNRHA],

17  including any revisions of the lease."  Paragraph 8(d) provides, "Except for the rent to

18  owner, the owner has not received and will not receive any payments or other

19  consideration (from the family, the PHA, HUD, or any other publice or private source) for

20  rental of the contract unit during the HAP contract term."

21          Part C of the HAP contract is the "Tenancy Addendum," and constitutes an

22  addendum to the lease as provided in Paragraph 8 of Part B of the HAP contract.  As

23  recited in Paragraph 12.b of Part B, "[t]he tenant or the PHA may enforce the tenancy

24  addendum (Part C of the HAP contract) against the owner, and may exercise any right or

25  remedy against the owner under the tenancy addendum."

26

1   Paragraph 2.a of the Tenancy Addendum recites that, "[t]he owner has given the

2   PHA a copy of the lease, including any revisions agreed by the owner and the tenant.  The

3   owner certifies that the terms of the lease are in accordance with all provisions of the HAP

4   contract and that the lease includes the tenancy addendum."  Paragraph 2.b provides:

5   > The tenant shall have the right to enforce the tenancy addendum against the
>   owner.  If there is any conflict between the tenancy addendum and any other
6   > provision of the lease, the language of the tenancy addendum shall control.

7   Paragraph 4.a of the Tenancy Addendum recites that "[t]he initial rent to owner may

8   not exceed the amount approved by the PHA in accordance with HUD requirements."

9   Paragraph 4.b provides that "the owner may not raise the rent during the initial term of the

10   lease."

11   Paragraph 5.e of the Tenancy Addendum provides that "[t]he owner may not charge

12   or accept, from the family or from any other source, any payment for rent of the unit in

13   addition to the rent to owner.  Rent to owner includes all housing services, maintenance,

14   utilities and appliances to be provided and paid by the owner in accordance with the lease."

15   Paragraph 5.f of the Tenancy Addendum provides that "[t]he owner must immediately

16   return any excess rent payment to the tenant."

17   Paragraph 14(b) of the Tenancy Addendum provides:

18   > In case of any conflict between the provisions of the tenancy addendum as
>   required by HUD, and any other provisions of the lease or any other
19   > agreement between the owner and the tenant, the requirements of the HUD-
>   required tenancy addendum shall control.
20

21   <u>Analysis</u>

22   The essential elements of liability under the False Claims Act are as follows: (1) a

23   false statement or fraudulent course of conduct, (2) made with scienter, (3) that was

24   material, (4) causing the government to pay out money or forfeit money due.  *United States*

25   *v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

26

1    As to whether Galliano made a false statement or engaged in a fraudulent course of

2  conduct, the defendants concede that Benitez "may be able to show [Golden River]

3  erroneously interpreted the HAP Contract and related documents it actually reviewed."  As

4  Galliano's agent, Golden River's interpretation is attributable to Galliano.  The concession

5  is appropriate.  Pursuant to the HAP contract and the lease, the rent to owner that the

6  defendants were entitled to receive was $994, which amount included fees for sewer and

7  trash.  Galliano represented and agreed, in the HAP contract and the Tenancy Addendum

8  to the lease, that it would not collect rent from Benitez or any other source that was in

9  addition to this amount.  However, from the outset of the tenancy, Galliano charged and

10  collected or attempted to collect $197 from Benitez in excess of her portion of the rent to

11  owner.  This conduct rendered Galliano's representations that it would not collect additional

12  rent from Benitez false; conversely, Galliano's representation that it would not charge or

13  collect additional rent establishes that its subsequent conduct of charging Benitez

14  additional rent each month was fraudulent.

15    The defendants also do not dispute that Galliano's statement–that it would not

16  collect additional rent–caused the government to pay out money.  The SNRHA receives

17  money from United States each year pursuant to Section 8, a portion of which it used to

18  subsidize Benitez' rent payments throughout her tenancy.  Had Galliano not entered into

19  the HAP contract, in which it represented and agreed that it would not collect additional rent

20  from Benitez, the SNRHA would not have made any assistance payments to Galliano.

21    The parties do dispute, however, whether Galliano's statements and conduct were

22  made with scienter and whether the statements and conduct were material to the

23  government paying out the money.

24    The Court will begin by considering whether the statements and conduct were

25  material.  The defendants argue that Benitez cannot show that Galliano's statements that it

26  would not collect additional rent, and the subsequent conduct of charging additional rent,

1   were material because the SNRHA didn't actually take action against them despite having

2   "actual notice" that Galliano sought authority to collect $1,191 from Benitez.  They also

3   assert that, assuming the SNRHA lacked notice, the SNRHA would not have cancelled the

4   contract but would have required a corrective lease.  The evidence, when construed in

5   favor of the defendants, establishes that the breach was material as a matter of law.

6         The defendants' first argument rests on the premise that the SNRHA had actual

7   notice that Galliano sought authority to collect $1,191 from Benitez.  The argument fails

8   because the amount of money for which Galliano originally sought authority to collect is

9   irrelevant.  The SNRHA did not enter into a HAP contract with Galliano based upon the

10  amount of rent that Galliano originally sought for the housing unit from Benitez.  Rather, the

11  statements of Galliano that are relevant to materiality is that Galliano agreed that it would

12  reduce the rent to $994, and agreed that it would not attempt to collect the difference

13  between the amount originally sought and the reduced amount, and agreed that it would

14  not seek rent in addition to $994.

15        The defendants next argue that Galliano's statements–that it would not collect

16  additional rent (and its conduct of collecting additional rent contrary to those

17  representations)–were not material because the SNRHA admitted that it would have

18  required a corrective lease under the circumstances.  The argument fails as it rests upon

19  an incomplete summary of the deposition testimony cited by the defendants.  The

20  deponent, the person most knowledgeable for the SNRHA, testified that the SNRHA would

21  have rejected the lease in the first instance.  For a lease that had somehow been

22  approved, she testified that the SNRHA would have stopped the HAP contract, and the

23  owner and tenant would have to submit a new packet.  The deponent further denied that a

24  process existed to merely issue a corrective notice.  That the deponent testified that the

25  SNRHA would require the submission of a corrected lease is irrelevant.  Such a corrected

26  lease would be required for the owner to enter into a new HAP contract based upon the

1   new lease.  At issue, however, is whether the SNRHA would have entered into the original

2   lease absent Galliano's representations that it would reduce the rent to $994, would not

3   seek to collect the difference caused by the reduction, and would not charge or collect rent

4   in addition to the $994.  The undisputed evidence is that the SNRHA would not entered into

5   the HAP contract.  Accordingly, the Court finds that not only did Galliano's statements and

6   conduct cause the government to pay money, but those representations were material in

7   causing the government to pay money.

8       The last issue the Court must address is whether Galliano made its statements, and

9   engaged in its conduct, with scienter.  That the statements and conduct occurred and were

10  material does not establish that Galliano acted with scienter in making the statements and

11  engaging in the conduct.

12      The defendants argue that Benitez cannot establish that Galliano acted with scienter

13  because Galliano reasonably interpreted the lease as authorizing them to collect the total

14  amount of $1,191 each month from Benitez, which amount included both rent and "non-

15  rent obligations."  The defendants' motion, and their oppositions to Benitez' motion,

16  provides scant support for their argument.

17      The defendants assert such an interpretation would be reasonable because "the

18  subject Lease expressly states that the total amount of monthly payments, including

19  non-rent obligation shall be $1191."  In their Undisputed Fact #16a, they clarify that:

20  "[s]pecifically, under Section 3 of the Lease, total monthly payment including non-rent

21  obligations shall be $1191."  The assertion is contrary to the language of Section 3.

22      First, as relevant to this dispute, Section 3 (captioned "ADDITIONAL MONIES

23  DUE:") provides that the "RENTAL PAYMENT WILL BE $1,191 INCLUDING SEWER &

24  TRASH. . .."  Accordingly, and fatal to the defendants' argument, Section 3 does not

25  authorize the collection of a *total* payment, but rather the collection of a *rental* payment.

26

1    Second, contrary to defendants' characterization, Section 3 neither uses,

2 references, nor defines the phrase: "non-rent obligations."  In apparent support for their

3 argument that Section 3 governs "non-rent obligations," the defendants characterize

4 Section 16 of the lease as "a list of non-rent obligations. . .."  As with their characterization

5 of Section 3, this characterization of Section 16 is also contrary to the language of the

6 lease.  Section 16 of the lease governs "UTILITIES."  The section allocates the

7 responsibility for paying for the utilities, and identifies and allocates the party having

8 responsibility to connect the utilities in their respective name.

9    Section 16 does reflect an agreement that Benitez would be responsible for paying

10 for all utilities.  The section lacks any language, however, that Benitez' obligation to pay for

11 these utilities constituted a "non-rent" obligation that she owed to Galliano.  Section 16.a of

12 the lease allocates to Benitez the responsibility for obtaining and connecting (as

13 appropriate) electricity, gas, water, phone and cable in her name.  As these utilities would

14 be in Benitez' name, she would not make these payments to Galliano.

15    Section 16.b of the lease allocates to Galliano the obligation of maintaining the

16 connection for sewer and trash in its name, and further provides that Galliano would "bill

17 [Benitez] for connection fees and use accordingly."  Section 16.b does not, however,

18 establish that Benitez' payment of sewer and trash fees to Galliano would be a "non-rent"

19 obligation.  Rather, as recited in Section 3 of the lease, the parties agreed that the sewer

20 and trash fees would be included within the amount paid as rent.

21    Given that the language of Section 3 is contrary to an interpretation that the total

22 monthly payment (including non-rent obligations) would be $1,191, the defendants'

23 argument actually appears to rest on an unstated premise: that the phrase in Section 3 that

24 "rental payment will be $1,191 including sewer and trash" conflicts with other terms of the

25 lease as well as with the terms of the HAP contract.  As such, the phrase can be

26 reasonably interpreted, in the context of those controlling provisions, to ignore the word

1    "rental," leaving the phrase "payment will be $1,191 including sewer and trash."  The Court

2    disagrees.

3           Without dispute, the phrase "rental payment of $1,191" in Section 3 directly conflicts

4    with Section 6 of the lease, which is captioned "RENT," and which appears on the same

5    page of the lease as Section 3.  Section 6 expressly provides that "TENANT shall pay rent

6    at the monthly rate of $994.00. . .."  Section 3 also conflicts with Section 5 of the lease,

7    which is captioned "TERM."  Section 5 states that "[t]he term hereof shall commence on

8    January 17, 2013, and continue until January 31, 2014, for a total rent of 12,409.00. . .."

9    When considered in light of the initial term of the lease, the amount of the total rent

10   identified in Section 5 is consistent with a monthly rent of $994, as identified in Section 6.

11   Further, on January 3, Galliano signed a "Reduction of Rent Acknowledgment" indicating

12   an agreement to reduce the rent to $994 so that Benitez could qualify for payment

13   assistance for the housing based upon the 40% rule.

14          In addition, Section 4.a of the Tenancy Addendum (Part C of the HAP contract)

15   provides that "[t]he initial rent to owner may not exceed the amount approved by the PHA in

16   accordance with HUD requirements."  As with Sections 5 and 6 of the lease, Section 6 of

17   Part A of the HAP contract established that the amount approved by the SNRHA as the

18   initial rent was $994.  Pursuant to Section 14 of the Tenancy Addendum (Part C of the HAP

19   contract), "[i]n case of any conflict between the provisions of the tenancy addendum as

20   required by HUD, and any other provisions of the lease or any other agreement between

21   the owner and the tenant, the requirements of the HUD-required tenancy addendum shall

22   control."

23          Given that Section 3's recitation that the rental payment is $1,191 conflicts with the

24   governing terms of the lease and Tenancy Addendum which establish that the rent is $994,

25   the only possible interpretation of the lease is that the rent is $994.  Any other interpretation

26   would be unreasonable, frivolous and in bad faith.  Further, the defendants do not argue

1  lease can be reasonably interpreted as allowing them to collect rent in the amount of

2  $1,191.

3      Rather, the defendants' argument rests upon a different conflict that they assert

4  exists between the language of Section 3 and the HAP contract: the HAP contract excludes

5  sewer and trash from rent but Section 3 includes sewer and trash[4] as part of the rent.

6  They refer to Section 8 of Part A of the HAP contract, arguing that it establishes that

7  Benitez was responsible for paying the fees for sewer and trash.  Pursuant to Section 5.e

8  of the Tenancy Addendum, these fees would not be included in the rent to owner.

9  According to the defendants' argument, as the amount identified in Section 3 was $1,191,

10  and as this amount includes "sewer and trash," and as the rent could not exceed $994, it is

11  the word "rental" that conflicts with the other terms of the lease, and that can reasonably be

12  disregarded in interpreting the lease.  Accordingly, and stripped of the defendants'

13  obfuscating "non-rent obligations" language, the defendants argument is that they could

14  reasonably interpret Section 3 as stating: Galliano is authorized to collect (a) rent in the

15  amount of $994 and (b) sewer and trash fees in the amount of $197.  Such an

16  interpretation is unreasonable, and borders on the frivolous, because Benitez did not agree

17  to pay $197 for sewer and trash fees.

18      The defendants argue that "[n]owhere under the HAP Contract or related regulation

19  is it mentioned that GRI and Relator cannot agree upon an amount for non-rent obligations

20  subject to disclosure and approval by SNRHA."  The argument rests upon the faulty

21  premise that the HAP contract and the related regulations permit agreements for "non-rent

22  obligations."  As noted above, the concept of "non-rent obligations" does not appear

23

---

24      [4]    While the defendants characterize the $1,191 as including "non-rent"
obligations, they never specifically identify the "non-rent" obligations they assert were owed
25  by Benitez.  Nothing in the lease identifies non-rent obligations.  Rather, the lease and the
HAP contract reference utilities and permit the relevant parties to allocate the responsibility
26  for paying for those utilities.  Pursuant to the lease and the HAP contract, Benitez was
responsible for paying for sewer and trash.

anywhere within the HAP contract nor the lease.  Rather, the HAP contract (and related regulations) permit the owner to receive rent.  The HAP contract (and related regulations) permit the owner and the tenant to allocate responsibility for paying for the utilities necessary to habitation of the housing unit.

Further, the defendants do not direct the Court's attention to any evidence supporting even an inference that Galliano and Benitez agreed that sewer and trash fees were $197.  Rather, an agreement that Benitez would pay $197 for sewer and trash conflicts with other provisions of the lease and the HAP contract.  Section 8 recites that Benitez was responsible for paying the utility fees for sewer and trash; it does recite that the amount of those fees was $197.  The only evidence before this court of the actual amount of sewer and trash fees establishes that they did not exceed $35.  In addition, in Section 2 of the lease, the parties recited that the amount owed for sewer and trash was $35.  As such, the only evidence before the Court is that Galliano and Benitez agreed that the amount of sewer and trash fees would be $35.  Accordingly, interpreting Section 3 as authorizing the collection of $197 for sewer and trash fees is unreasonable.

Interestingly, Golden River asserts, in its opposition to Benitez' motion and citing Tam's Declaration, that:

> As SNRHA is often not obligated to pay the entire rent and bears no responsibility for Non-Rent Obligations, Tenant agreed to sign Addendum #2, acknowledging that she would pay the balance of $1191 for the contract unit and for Non-Rent Obligations.

Addendum #2 provided:

> The rent is $1191 per month, which includes sewer and trash.  Tenant, Norma Ariasbenitez has Section 8.  Tenant is responsible to pay the remaining portion of what Section 8 does not cover.

To the extent Golden River is arguing that Galliano had Benitez agree to pay the balance between $1,191 and the rent paid by SNRHA and Benitez' non-rent obligations in anticipation that the SNRHA might reduce the rent, the argument amounts to nothing less

1    than an admission of scienter.  Galliano had Benitez agree to pay the difference resulting

2    from a reduction of rent that Galliano anticipated the SNRHA would require.  Galliano could

3    only have enforced this agreement knowing (or deliberating ignoring or recklessly

4    disregarding) that it had represented that it would not collect the difference resulting from

5    the reduction in rent and that it would not collect additional rent from Benitez.

6    Further, even if Golden River is arguing that, in anticipation that the SNRHA might

7    reduce the rent, Galliano had Benitez agree that the sewer and trash fee was equal to the

8    *balance* between $1,191 and the rent approved by the SNRHA, the argument is, again, an

9    admission of scienter.  Requiring a tenant to agree that the amount owed for sewer and

10   trash would be determined without any basis to the actual fees for those utilities, but rather

11   would be based solely on difference between $1,191 and the approved rent, is a poorly

12   disguised agreement that Benitez would pay additional rent.  Galliano could not reasonably

13   interpret its own agreement with Benitez as an agreement to pay sewer and trash fees.

14   Galliano could only have enforced this agreement knowing (or deliberating ignoring or

15   recklessly disregarding) that it had represented that it would not attempt to collect

16   additional rent from Benitez.

17   Finally, while the defendants have argued they could have reasonably interpreted

18   the lease and HAP contract as permitting them to collect $197 from Benitez for sewer and

19   trash, they do not direct the court's attention to any evidence that Galliano actually

20   interpreted the lease and HAP contract in this manner.  Rather, the evidence before the

21   Court is that Galliano interpreted the contract to authorize them to collect $1,191 as rent,

22   and that this amount included sewer and trash.

23   Pursuant to the express terms of the lease, the prorated rent from January 17, 2013,

24   through January 31, 2013, was $481.  The defendants recorded, in their ledger,[5] that they

25   _____

26   [5]    The defendants have argued that the ledger is inadmissible because it is not
     authenticated.  The Court recognizes that Benitez did not authenticate the document until

1   charged the SNRHA $180 for this period, which the SNRHA paid.  Such payment

2   establishes that the rent owed by Benitez for this period was $301.  However, the

3   defendants recorded that they charged Benitez rent in the amount of $416, which

4   establishes they charged her additional rent in the amount of $115.  As recorded in the

5   ledger, the defendants collected rent in the amount of $420 from Benitez, or $119 in

6   excess of her portion of the rent for January 2013.

7          The defendants recorded that, for February 2013, they charged the SNRHA $371 for

8   its Section 8 portion of the rent.  The defendants recorded that the SNRHA paid $371, and

9   they allocated this payment to "rent + sewer/trash."  Golden River has argued that Galliano

10  caused Benitez to sign Addendum #2, in part, because SNRHA would not be responsible

11  for "non-rent obligations."  Fees for a utility are part of the rent to owner only if the utility is

12  provided and paid for by the owner.[6]  Section 3 of the lease provided that the rental

13  payment "included sewer and trash."  Accordingly, this portion of the ledger shows that

14  Galliano interpreted the lease and HAP contract, and treated the payment from the

15  SNRHA, to include the fees for sewer and trash within the rent to owner.  As the approved

16  amount of rent was $994, the balance of the rent owed by Benitez was $623.  However,

17

18  _____

19  her reply to her motion.  Counsel for Benitez indicates he received the ledger from Golden
    River on August 20, 2015.  That date suggests counsel received the document in
20  connection with Galliano's efforts to evict Benitez for failure to pay her rent.
            In seeking summary judgment on Benitez' declaratory judgment claim seeking a
21  determination that she does not owe late fees, the defendants rely on Tam's Declaration,
    which Golden River submitted in opposition to Benitez' motion.  The defendants argue that
22  in her declaration, Tam declares that Golden River "did account for late fees incurred each
    month."  The Court cannot discern any such statement in the declaration.  Rather, Tam
23  only asserts that "[d]espite being advised of late fees by GRI staff, Tenant allowed
    substantial late fees to accrue on her account by making late payments."  Nevertheless,
24  the Court would note that the ledger does support the defendants' argument that Golden
    River accounted for the late fees as they accrued each month.

25          [6]      Section 5.e of the Tenancy Addendum provides, "[r]ent to owner includes all
26  housing services, maintenance, utilities and appliances to be provided and paid by the
    owner in accordance with the lease."

the defendants recorded that they charged, and Benitez paid, rent in the amount of $820, or additional rent in the amount of $197.

The defendants' record for the month of March is similar, charging rent to both the SNRHA and Benitez. As in February, the defendants allocated the SNRHA's payment to rent and sewer and trash. As in February, the defendants charged Benitez rent in the amount of $494, exceeding her portion of the rent by $197. The defendants recorded a payment from Benitez in the amount of $409, an amount that was $112 in excess of her portion of the rent.

Beginning in April 2013, the defendants no longer allocated SNRHA's payment to "rent + sewer/trash." Rather, the defendants recorded SNRHA's payment as the "Sec 8 portion)." The defendants recorded that they charged Benitez rent in the amount of $494, exceeding her portion of the rent by $197. The defendants recorded receiving a payment from Benitez in the amount of $453, an amount that was $156 in excess of her portion of the rent. The defendants' ledger contains similar records for May, June, and July. Each month, the ledger records that they charged Benitez rent that exceeded her portion of the rent by $197. Benitez did not make any payment in July. In August, the defendants allocated Benitez' payment as paying the balance between the amount they charged and the amount Benitez paid for rent for March through June, with the remainder allocated to her rent obligation for July.

The remainder of the defendants' ledger follows the same pattern. Each month, they charged Benitez an amount for rent that exceeded her portion of the rent by $197. Throughout the tenancy, they allocated all payments from Benitez to rent. The defendants never recorded a charge against Benitez for either sewer or trash. At no time did the defendants allocate any payment received from Benitez as paying for either sewer or

1  trash.[7]  Entirely absent from the defendants' ledger is any use of the term "non-rent"
2  obligation.

3       Galliano could not reasonably construe the lease and HAP contract as authorizing
4  the collection of $994 for rent and $197 for sewer and trash.  Further, Galliano did not
5  interpret the lease in this manner.  Rather, despite the terms of the lease and the HAP
6  contract, Galliano charged and collected (or attempted to collect) rent in the amount of
7  $1,191 each month, knowing (or recklessly disregarding or deliberately ignoring) that this
8  amount exceeded the approved monthly rent of $994.  Accordingly, even construing the
9  evidence in favor of the defendants, the Court finds that Galliano acted with scienter when
10  it agreed and represented to the SNRHA that it would reduce the rent, that it would not
11  collect the difference resulting from this reduction, and that it would not collect additional
12  rent from Benitez, but then charged and collected additional rent from her.

13  Damages

14       Any person who violates the FCA is liable to the United States for not less than
15  $5,500 and not more than $11,000, plus three times the damages suffered by the United
16  States as a result of the violation.  31 U.S.C. §3729(a)(1) and (3); 28 C.F.R. 85.3.

17       The appropriate measure of the damages suffered by the United States is the sum
18  of all payments made by the United States under the HAP contract.  Pursuant to the HAP
19  contract, the SNRHA paid Galliano $25,185 during the period January 2013 through
20  October 2015.  Multiplying this amount by three times results in damages of $75,555.

21       The parties do not dispute that each violation of the FCA gives rise to separate
22  liability and thus a separate civil penalty.  *United States ex rel Hendow v. Univ. of Phoenix,*
23  461 F.3d 1166 (9th Cir. 2006).  Benitez argues that the defendants violated the FCA each

24

25         [7]    Further, to the extent the ledger can be construed as identifying the amount
26  of fees for sewer and trash, it suggests that those fees were $35, consistent with Section 2
of the lease.

month they charged her for additional rent (32 months) and in each of the two additional months they did not charge her additional rent but still received an assistance payment from the SNRHA.  Citing *United States ex rel. Oliver v. The Parsons Corp.*, 498 F.Supp.2nd 1260, 1292 (C.D. Cal. 2006), the defendants argue the only violation of the FCA occurred when it entered into the HAP contract with the SNRHA.  The language upon which the defendants rely relies is, as expressed by that court, dicta.  The court had denied the defendants' motion to limit the damages to only the two initial disclosures that it would use a specific accounting practice.  The court nevertheless indicated its determination that awarding damages for each (of what the court described as) 4,056 indirect expense rate claims would result in "astronomical damages" that could not "logically be what Congress intended."

The present matter does not concern indirect expense rate claims under an accounting standard other than as represented in disclosure statements.  Rather, the present matter involves two separate statements by the defendants regarding the rent to be charged to Benitez.  In the Reduction of Rent Acknowledgment, Galliano agreed to reduce the rent to $994, agreed that no additional rent would be collected from Benitez, agreed to reduce the security deposit to not exceed the monthly amount, and agreed that it could not "collect the difference in the rent change from" Benitez, and agreed that doing so would be a breach of the HAP contract.  In the HAP contract, Galliano agreed that the rent was $994, agreed that other than the rent to owner, it would not receive any payments or other consideration from Benitez for rental of the unit, and agreed that it would not charge or accept any payment from Benitez for rent of the unit in addition to the rent to owner, and agreed that it would immediately return "any excess payment to the tenant."  Thus, if the violations are to be measured solely by the false statements, Galliano committed at least two violations when it signed each of these documents.

1    In contrast to *Oliver*, each month's charge for and collection of additional rent from

2  Benitez was directly contrary to Galliano's numerous representations that it would reduce

3  the rent, would not collect the difference resulting from the change, and would not charge

4  or receive rent in addition to the approved rent of $994.  Further, the present matter does

5  not involve more than 4,000 indirect violations, but at most 34 monthly actions directly

6  contrary to Galliano's representations.  Even the maximum penalty sought by Benitez,

7  $374,000, does not constitute an "astronomical penalty" that Congress could not logically

8  have intended.  Rather, it readily falls within an expected penalty for repeated conduct

9  extending over two and a half years.  Accordingly, the Court finds that each month in which

10  Galliano both received an assistance payment and charged Benitez additional rent

11  constitutes a separate violation of the FCA.

12    The Court finds that a closer question exists whether violations occurred in the last

13  two months of the tenancy.  During those months, Galliano did not charge or collect

14  additional rent from Benitez, but did receive assistance payments from the SNRHA.  The

15  Court finds that Galliano's acceptance of assistance payments in months in which it did not

16  attempt to collect excess rent does not constitute a separate violation of the FCA.

17  Accordingly, the Court finds that Galliano committed 32 violations of the FCA.

18    As to the appropriate amount of the penalty for each violation, the Court finds that,

19  from the outset of the process, Galliano not only intended to collect $1,191 each month

20  from Benitez, but was aware that she was a Section 8 tenant, and that the amount of rent

21  was subject to the approval of the SNRHA.  Galliano engaged in a course of conduct to

22  ensure that it could collect $1,191 for the rental of the unit, regardless of the amount of rent

23  approved by the SNRHA.  Further, Galliano placed on Benitez the entire burden of

24  offsetting any reduction in rent from the amount of $1,191 on Benitez.  Galliano was

25  notified and agreed on two separate occasions in two separate documents to reduce the

26  rent, to not collect the difference caused by the reduction, and to not collect rent in addition

1   to the authorized amount.  From the outset of the tenancy, Galliano ignored the terms of

2   the lease and the HAP contract, and instead charged Benitez rent an amount that would

3   ensure it collected $1,191 for the rental of the unit.  The only mitigation in favor of Galliano

4   is that (assuming the HAP contract excluded sewer and trash from the amount of rent) its

5   efforts were directed at obtaining the amount of $162.  Such mitigation, however, must be

6   considered in the context that Galliano sought this payment from a person whom it knew

7   required assistance in the payment of rent.  While the Court believes that a penalty of

8   $11,000 for each violation could be supported, the appropriate penalty under the

9   circumstances of this case is $5,500 for each violation.  Such amount is sufficient and

10  appropriate in light of the nature of each of the 32 violations of the FCA.  Further, as the

11  conduct of Galliano resulted from the actions of Golden River on behalf of Galliano, both

12  Galliano and Golden River are liable.  Accordingly, the defendants must pay a penalty of

13  $176,000.

14        Benitez is further entitled to her costs for bringing this civil action to recover a

15  penalty and damages under the FCA.

16  Late Fees

17        In her Amended Complaint, Benitez seeks a declaration that the defendants

18  erroneously charged late fees.  Golden River (but not Galliano) has filed a counterclaim

19  alleging Benitez agreed to pay Golden River monthly payments in a timely manner, but

20  breached that agreement by failing to pay in a timely manner and failing to pay the

21  associated late fees, eviction fees, and advances.  Golden River further asserts this

22  conduct breached the implied covenant of good faith and fair dealing, and unjustly enriched

23  Benitez due to her retaining and using the property without making timely payments.

24        The defendants argue that summary judgment should be granted in their favor on

25  Benitez' late fees claim because they did not intentionally relinquish their right to collect late

26  fees.  They assert Benitez was "notified" that they were imposing late fees because she

signed the lease, which identifies the date on which rent was due, recites that late fees would be imposed, and establishes the amount of the late fees.  The defendants argue that, in her declaration, Tam declares that Golden River "did account for late fees incurred each month."  The Court cannot discern any such statement in the declaration.  Rather, Tam only asserts that "[d]espite being advised of late fees by GRI staff, Tenant allowed substantial late fees to accrue on her account by making late payments."  Nevertheless, the Court would note that the ledger does support the defendants' argument that Golden River accounted for the late fees as they accrued each month.

The ledger also indicates, however, that Golden River did not allocate any payment from Benitez to the recorded late fee.  Rather, the notations within the ledger allocate her payments to her rent for each month.  Whether Galliano or Golden River actually notified Benitez of the late fees remains a question of fact.  Further, in light of the Court's determination that Galliano sought and collected additional rent from Benitez each month, a fact remains whether Benitez payments were late or, if so, the extent to which she paid those late fees.  The Court will deny the defendants' motion to dismiss Benitez' declaratory judgment claims.

Conversely, Benitez' motion to dismiss the breach of contract claim fails.  In the context of this case, and the allegations of her own Amended Complaint, the allegations of the counterclaim are sufficient to permit Benitez to defend herself against the claim.

The Court agrees with Benitez that Golden River has not alleged claims for breach of the implied covenant of good faith and fair dealing or for unjust enrichment.  Golden River's claim for breach of the implied covenant is merely duplicative of its breach of contract claim: Golden River does not allege that Benitez complied with literal terms of the contract but acted in bad faith; rather, it alleges only that she breached the terms of the contract.

Similarly, Golden River cannot maintain its unjust enrichment claim.  To the extent Golden River is alleging Benitez retained the late fees and other fees owed under the contract, the claim is merely duplicative of its claim for breach of contract.  To the extent Golden River brings this claim on the basis of some other benefit retained by Benitez, it has not alleged any facts indicating what benefit Golden River conferred and Benitez retained.  THEREFOR, for good cause shown,

THE COURT **ORDERS** that Defendants' Motions to Dismiss (ECF Nos. 18, 19) are DENIED as moot.

THE COURT FURTHER **ORDERS** Plaintiff's Motion to Dismiss Counterclaim (ECF No. 43) is DENIED as to Golden River Investments, LLC First Cause of Action, and si GRANTED as to its Second and Third Causes of Action.

THE COURT FURTHER **ORDERS** that Defendant Galliano, LLC's Motion to Strike (ECF No. 58) is DENIED.

THE COURT FURTHER **ORDERS** that Defendant Golden River Investments, LLC's Motion for Summary Judgment (ECF No. 62), which motion Defendant Galliano, LLC joined (ECF No. 63) is DENIED.

THE COURT FURTHER **ORDERS** that Plaintiff Norma Arias Benitez' Motion for Partial Summary Judgment (ECF No. 42) is GRANTED.

THE COURT FURTHER **ORDERS** that Plaintiff Norma Arias Benitez shall, not later than 14 days after entry of this Order, submit a proposed Partial Summary Judgment consistent with this Order.

DATED this _____ day of January, 2018.

Lloyd D. George
United States District Judge